**UNITED STATES of America**

v.

**Daniel OCAMPO, Theodoro Hernandez, Carlos Cardona, Jose Vincente Otero, Nicholas A. Munoz-Velasquez, Defendants.**

**No. 80 CR 00061.**

United States District Court, E. D. New York.

June 2, 1980.

Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for United States of America; Thomas G. Roth, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Diller, Schmuckler & Asness, New York City, for defendant Ocampo; Martin Schmuckler, New York City, of counsel.

Axelrod & Warburgh, New York City, for defendant Hernandez; Paul E. Warburgh, Jr., New York City, of counsel.

Ira Leitel, New York City, for defendant Cardona.

Edward S. Panzer, New York City, for defendant Otero.

Santangelo, Santangelo & Cohen, New York City, for defendant Munoz-Velasquez; George Santangelo, New York City, of counsel.

BARTELS, District Judge.

This suppression motion raises questions concerning the sufficiency of the evidence necessary to satisfy the legal and constitutional standards applicable to unwarranted arrests, investigative stops, consent searches, plain view seizures, auto searches, warranted apartment seizures, post-arrest statements, and photographic and in-court identifications. Defendants Daniel Ocampo, Theodoro Hernandez, Carlos Cardona, Jose Vincente Otero, and Nicholas Antonio Munoz-Velasquez are charged in a two-count indictment with distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and conspiracy to violate 21 U.S.C. § 841(a)(1), in violation of 21 U.S.C. § 846.[1] Claiming their arrests and the resulting searches and seizures violated their Fourth Amendment rights, defendants now move pursuant to Fed.R.Cr.P. 12(b)(3) to suppress certain evidence thus obtained, including approximately $700,000 in cash. A lengthy hearing was held at which evidence of the circumstances surrounding the arrests and searches was adduced and the issues presented were argued by all counsel. After consideration of the evidence and the pertinent legal questions raised, the Court hereby renders the following memorandum opinion containing its findings of fact and conclusions of law as required by Fed.R. Cr.P. 12(e).

---

1. The indictment originally charged defendants under a third count with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to this suppression hearing, however, the Government stated its intention to move to dismiss that count.

## FACTS

### A. *Background*

Over the period of the past several years, Drug Enforcement Administration ("DEA") Task Force Group 5, under the supervision of Special Agent William Mockler, Jr., has been investigating what is believed to be a large and sophisticated organization engaged in Colombian cocaine trafficking and controlled by one Jose Patino. In July 1979, members of Group 5 arrested Patino and seized from him certain documents. Together with papers seized in October 1978 from Heldar Pulgarin, a suspected drug associate of Patino, these documents constituted essential elements in the continuing investigation by Group 5 leading to the arrests and seizures in this case.

During his eleven years experience with the DEA, of which two years have been devoted to investigation of Colombian narcotics activities, Agent Mockler became familiar with the bookkeeping practices of narcotics dealers, and, based upon this expertise, he testified as an expert concerning the meaning of the Patino and Pulgarin documents. Seized from Patino, who was convicted for narcotics offenses, was a telephone and address book (Govt. Ex. 3) containing certain names and telephone numbers which, through decoding, Agent Mockler was able to decipher and learn the identities of persons thought to be Patino's colleagues and customers in cocaine trafficking. Among those identified were Daniel Ocampo, known as "Chino," address 1401 55th Street, Brooklyn; Theodoro Hernandez, known as "Negro," address 23–35 Broadway, Astoria, Queens; and Jose V. Otero, known as "Vicente," address 42–37 Hampton Street, apartment 2J, Elmhurst, Queens.

Seized from Pulgarin, who was convicted on a weapons charge, were several slips of paper (Govt. Exs. 1, 2) containing various names, telephone numbers, and figures suggesting narcotics transactions.[2] The name "Daniel" appeared on one of the slips next to Ocampo's phone number and on another slip next to the figure "1,000." Mockler's examination of DEA files also revealed that Ocampo had been arrested in Colombia in 1971 for possession of cocaine and that a government informant had stated that Ocampo was involved in drug traffic in Brooklyn. Ocampo's association with Tulio Enrique Ayerbe, a known narcotics dealer listed in Patino's book as "Toby," was confirmed by Group 5 members through pen register data showing calls from Ayerbe's phone to that of Ocampo and by observation of a meeting between Ocampo and Ayerbe.

Mockler's conclusion that "Negro" was a nickname for Hernandez was based on information from a reliable informant and documents seized around the time of Patino's arrest from a Bayside apartment for which Patino had rent receipts (Govt. Ex. 54). Those documents evidenced cocaine transactions involving "Negro" and listed debits in his name for attorney's fees and a bond. The amount of this bond was exactly the amount forfeited by Hernandez in 1978 when he failed to appear for an Immigration and Naturalization Service ("INS") deportation hearing after he had been turned over to INS by DEA agents who had arrested him on a narcotics charge. From a pen register placed on the phone of Ayerbe, Mockler obtained the number for an apartment at 23–35 Broadway in Astoria, which number was identical to that listed for "Negro" in Patino's address book.

### B. *January 22, 1980*

On January 22, 1980, members of Group 5, with this background information in mind, conducted a surveillance outside Ocampo's apartment building at 1401 55th Street in Brooklyn. As they sat in a car

---

**2.** For example, Government's Exhibit 1 contained long columns of addition and subtraction under the name "Alonzo," whom Agent Mockler assumed to be Patino associate Alonzo Zapata. Among the figures appearing on this document were "5. oz." and "32.000," which, according to Mockler, corresponded to the cost of a kilogram of cocaine selling at $1,000 an ounce at the time Pulgarin was arrested. The reverse side of this document contained the name "Daniel."

parked across the street, the officers observed Daniel Ocampo's wife come in and out of the building at two to three minute intervals between 5:00 and 5:55 P.M. looking around as if she were expecting someone. At 6:00 P.M., a car appeared with two occupants, subsequently identified as Louis Ibarguan (the driver) and Manuel Vasquez, known in Patino's book as "Korea." Vasquez entered the building and returned to the car five minutes later carrying an umbrella. The car then drove to 1163 43rd Street in Brooklyn, where Vasquez again left the car and entered the building. As Ibarguan made several turns around the block, Vasquez emerged briefly from the building, looked around, and reentered the building. At 6:45 P.M., he emerged again, this time carrying a large yellow shopping bag, got in the car, and proceeded out of the area. When Vasquez and Ibarguan were stopped several minutes later by the surveilling officers, the yellow shopping bag was searched and found to contain three bags of cocaine and $27,500 in cash.[3]

Following the arrest of Vasquez and Ibarguan, one of the officers found in the back seat of the suspects' vehicle a New York State vehicle registration in the name of Gustavo Rodriguez (Govt. Ex. 4) showing residence at 104–40 Queens Boulevard in Rego Park. Inquiry at that address revealed that Vasquez was the occupant of apartment 19D. Pen register data from a device placed on Ocampo's phone at 1401 55th Street showed that seven calls were placed from that address to Vasquez' phone at the Rego Park apartment on January 22, 1980 between 9:20 and 11:35 P.M.

### C. January 25, 1980

On January 25, 1980, between 1:30 and 7:30 P.M., New York City Police Officer Stuart Prakin and New York State Police Investigator Michael Purpura, both members of Group 5, conducted a surveillance of the sixth floor of the apartment building at 1440 Ocean Parkway in Brooklyn. In addition to having information that the sub-

scriber for the telephone in apartment 6C was Daniel Ocampo, the officers noted that his name appeared on both the mailbox and the doorbell in the lobby, and they discovered that the apartment was leased to him. Officer Prakin observed that the windows of the apartment had heavy curtains and steel gratings which, based on his experience, he knew to be characteristic of narcotics "stash pads." Officer Prakin was told by a neighbor that she did not believe the apartment was occupied, that various well-dressed South American men had been seen at unusual hours, and that they usually carried suitcases, cardboard boxes, or bags. She described one of these men as a middle aged male Hispanic with characteristics matching those obtained from Ocampo's DEA file. Officer Prakin also talked to another neighbor who confirmed this information.

### D. January 28, 1980

On January 28, 1980, Officer Prakin was again surveilling apartment 6C at 1440 Ocean Parkway when he saw a man matching Ocampo's description and carrying a brown paper shopping bag and a brown leather shoulder bag let himself into the apartment with a set of keys. Three minutes later he emerged from the apartment carrying only the shoulder bag and drove away in a 1979 blue Chevy Caprice Classic, license plate 289 UXE. At 5:35 P.M., he returned and again entered the apartment, and approximately an hour and ten minutes later he left carrying a blue and white flight bag (Govt. Ex. 10). With Investigator Purpura, Officer Prakin followed him to 1401 55th Street, where Ocampo double-parked, entered the building, and five minutes later returned carrying a medium-size cardboard box, which he placed in the trunk. He then entered the car and drove off.

Officer Prakin and Investigator Purpura followed Ocampo to the Burger King restaurant located at Caton Avenue and Dahill Road in Brooklyn. Soon thereafter, they

---

**3.** The legality of this stop and the subsequent arrests and seizures are not in dispute here.

Both Vasquez and Ibarguan pled guilty to narcotics charges.

were joined in other vehicles by Detective Kenneth Robinson, of the New York City Police Department, and DEA Special Agent Thomas Deignan pursuant to Agent Mockler's instructions from DEA headquarters. After parking his vehicle in the restaurant lot, Ocampo walked to the telephone booth on the corner of Dahill Road and Caton Avenue and, while holding the telephone receiver about six inches from his mouth, he looked nervously up and down Caton Avenue and Fort Hamilton Parkway. As Investigator Purpura walked within several feet of the phone booth and entered the restaurant, he observed that Ocampo appeared not to be speaking but that he dialed four or five digits before hanging up the receiver. Several seconds later, as Ocampo moved away from the telephone booth, a 1978 blue Buick, license plate 349 T70, with two occupants entered the lot through the Caton Avenue entrance. As the car entered, Ocampo and the driver of the Buick waved quickly at each other, and Ocampo proceeded into the restaurant as the Buick moved through the lot and parked next to Ocampo's vehicle. The driver of the Buick, subsequently identified as Theodoro Hernandez, stepped out, looked in the direction of Investigator Purpura who was now standing outside the Burger King lot on Dahill Road, quickly turned around, and walked into the restaurant through the door on Caton Avenue. The passenger of the Buick, later identified as Carlos Cardona, remained in the front seat.

From his vehicle on Caton Avenue, Detective Robinson then observed Hernandez walk to the counter, make a purchase, and move to the corner table where he sat with his back to Caton Avenue. After approximately ten minutes, Ocampo, who had been standing inside the restaurant by the Caton Avenue door, went to the counter, made a purchase, and walked over to the corner table where Hernandez was seated. Soon thereafter, they walked out of the restaurant and took separate routes to their respective cars, Hernandez on the Dahill Road side of the building and Ocampo through the lot.

Again in their vehicles, Ocampo was the first to leave the lot through the Dahill Road exit, turning left across traffic and heading toward Caton Avenue. Hernandez and Cardona followed, but because of traffic were unable to complete their left turn onto Dahill Road and, consequently, blocked traffic in the oncoming lane as they waited for an opening in the opposite lane. At this moment, Detective Robinson, driving one of the vehicles blocked in the oncoming lane, had a clear facial view of Hernandez, and before Hernandez drove on, Robinson recognized him as an INS fugitive whom he had arrested on a narcotics charge in 1978. Robinson immediately radioed this information to the other Task Force members in the vicinity.

As Ocampo, Hernandez, and Cardona left the area, they were followed by three government vehicles. Officer Prakin and Investigator Purpura, who was now riding with Agent Deignan, observed that Cardona, on the passenger side of the front seat of Hernandez' Buick, looked around constantly, suggesting a fear that they were being followed. Leaving the service road along which they had been proceeding, the Ocampo and Hernandez vehicles entered the Prospect Expressway, gained speed, and took the first exit back to the service road, apparently in an effort either to detect or evade surveillance. Fearing that the surveillance had been detected, the officers stopped the suspect vehicles at Fifteenth Street and Fifth Avenue in Brooklyn. They suspected at that time that the driver of the lead vehicle was Daniel Ocampo and the driver of the second vehicle was Theodoro Hernandez.

After parking his car directly behind the Hernandez car, Officer Prakin got out, walked to Hernandez' door, and, after displaying his shield, told him to shut off the engine. When he failed to do so, Prakin removed him from the car, arrested him, and frisked him. Seeing Cardona slide over to the driver's seat and place his left hand on the steering wheel with the car's engine still running, Investigator Purpura, with his gun drawn, moved to the driver's side of the Hernandez vehicle, reached in, turned

off the engine, identified himself, and escorted Cardona from the vehicle to the front hood where he spread Cardona's hands on the hood and held him with the gun. Ocampo was removed from his vehicle by Agent Deignan, who had parked his vehicle directly in front of Ocampo's. After placing Hernandez beside Cardona on the hood, Officer Prakin looked in the Buick with a flashlight and saw on the rear seat floor two adjacent brown paper bags, one of which was open and contained in plain view numerous bundles of U. S. currency (Govt. Exs. 8, 9, 9a–e). The contents of the second bag (Govt. Exs. 6, 7, 7a–e)—subsequently discovered also to be bundles of money—were covered by a single piece of brown paper, which covering Officer Prakin ripped after removing the bags from the car. He placed both bags in his automobile and locked it.

Prakin then walked over to Ocampo's car where, as Ocampo stood in the open door, Prakin looked in the car and saw in the middle of the front seat an unzipped blue and white flight bag, the same that Ocampo had carried out of the 1440 Ocean Parkway apartment. Upon removing it, approximately three to five feet away from the vehicle, Officer Prakin observed that it contained a brown leather shoulder bag (Govt. Ex. 11), also open, in which he found various documents, such as several loose papers (Govt. Ex. 12), a sheet containing names and phone numbers (Govt. Ex. 13), and a receipt book (Govt. Ex. 14). These bags and documents he also placed in his vehicle.

He returned to Ocampo's car, removed the keys from the ignition, and opened the trunk, in which he discovered the medium-size brown box (Govt. Ex. 15) which he had seen Ocampo carrying earlier that day. After removing the single three-inch strip of tape with which the box was closed, he opened it and observed a large plastic bag containing a white powder, later discovered to be inositol, a substance used in cutting cocaine.

Thereafter, Ocampo, Hernandez, and Cardona were taken to the 72nd precinct in Brooklyn where they arrived between 7:35 and 7:45 P.M. During the drive to the station, no attempt was made by the officers to interrogate the arrestees. Approximately fifteen minutes after their arrival, they were searched and certain articles were seized, including from Hernandez, a small black address and telephone book (Govt. Ex. 35) and a group of papers with handwritten notations and a driver's license in the name of Amparo Torres (Govt. Ex. 36); and from Cardona, three keys on a ring (Govt. Ex. 33).

Later that evening, the arrestees were transported to DEA headquarters on 57th Street in Manhattan and placed in detention cells on the 18th floor. At approximately midnight, Detective Guzman read the suspects their *Miranda* rights in Spanish from DEA Form 13B (Govt. Ex. 53) and informed them that they had been arrested for violation of the federal narcotics laws.[4] Each stated several times that he understood. Guzman then took Cardona into another room where he asked questions con-

---

4. DEA Form 13B was translated at the Court's request by court interpreter Dena Kohn. As sworn to in open court by Ms. Kohn, that translation reads as follows:

**Statement of Rights**

Before asking you any question it is my duty to inform you your rights.

You have the complete right to remain silent and not to make any statement if you so desire.

Any of your statements can be used against you in Court or any other proceeding.

You have the right to consult with a lawyer before making any statement or answering any question presented to you. And he may be present during the questioning.

You have the right to a lawyer who will be appointed by the U. S. Federal magistrate or Court in case of insolvency on your part.

If you wish to answer the questions presented to you without being represented by a lawyer, you may stop the questioning at any time to consult with the lawyer. But at the same time you have the right to waive the services of a lawyer and the right to remain silent. And you can answer all of the questions presented to you and make a statement without having to consult a lawyer if you wish.

Do you understand your rights?

Do you choose to waive your rights?

*Tr.* at 2349–50 (May 7, 1980).

cerning pedigree information for DEA Form 202, and Cardona answered that he had no phone but that he lived in Queens, perhaps on 147th Street. When Cardona stated that he was willing to cooperate with the government, Guzman again read Cardona his *Miranda* rights and told him that he did not have to make any statement if he did not wish to, but that if he did so, it would have to be truthful. Cardona then explained that he had been in Flushing Park with Jorge, whom he identified by pointing at Hernandez (who was in the room being fingerprinted at the time), that a person known as Villegas (age 32–33, 130 lbs., 5'8", moustache, light-skinned Colombian) gave them some money to deliver to the Burger King in Fort Hamilton, and that Villegas gave them $20 for carfare. Detective Guzman then left, promising to return later. When Guzman returned 45 minutes later, Cardona said he had no information to give, denied knowing or having been with Hernandez, and disclaimed any knowledge of the money seized at the time of arrest.

At approximately 9:00 P.M., Officer Prakin and Special Agent Crawford returned to 1440 Ocean Parkway, apartment 6C, to secure the location until a search warrant could be obtained. They made no attempt to enter the apartment.

### E. *January 29, 1980*

At 10:00 A.M. on January 29, 1980, Agent Mockler appeared with a warrant to search apartment 6C at 1440 Ocean Parkway (Govt. Ex. 16) and, together with four other agents, obtained access with keys taken from Ocampo at the time of his arrest. During the course of the two-hour search, the agents discovered and seized (1) a white plastic bag containing a white powder (Govt. Ex. 17), found under the nightstand by the bed; (2) a shoe box containing $49,-990 in cash (Govt. Exs. 18, 19, 19a), found in the bedroom closet; (3) a shopping bag containing $45,000 (Govt. Exs. 20, 21, 21a), found also in the closet; (4) a green laundry bag containing shirts, pistols, and ammunition (Govt. Exs. 22–27), also found on a night stand in the bedroom; (5) a manila envelope and box of magic markers (Govt. Ex. 28), found in the top dresser drawer; (6) an all-purpose receipt book (Govt. Ex. 29), found also in the dresser drawer; (7) a manila envelope containing assorted pages from the receipt book and other note papers (Govt. Exs. 30–31), with writing and figures, found in the same dresser drawer. When the officers left the apartment at 12:10 P.M., they left a copy of the warrant listing these articles and others removed from the apartment (Govt. Ex. 32).

As noted *supra*, several documents (Govt. Exs. 12, 13) were seized from Ocampo at the time of his arrest, one listing various meetings at "BK" and "MC" on particular days of the week with named individuals, and the other containing many names and telephone numbers. Predicated upon analysis of these documents, Agent Mockler inferred that one of the meetings listed at "BK" on "Lunes" at "7:00 p. m." with "Grone" was the Burger King meeting on January 28, 1980 subsequent to which Ocampo, Hernandez, and Cardona were arrested. He further hypothesized that subsequent meetings would be held at an unspecified McDonalds fast food restaurant ("MC") and again at the Burger King on Thursday, January 31, 1980, at 1:00 P.M. with "Vic." Using the telephone list together with Patino's telephone book, Agent Mockler determined by decoding that "Grone" ("Negro" with syllables reversed) was Hernandez and "Vic" was Jose V. Otero ("Vic" for "Vicente").

### F. *January 31, 1980*

Although agents were placed at two different McDonalds restaurants in Brooklyn, they met with no success. However, on January 31 at 12:40, guided by Ocampo's schedule of meetings, Agent Mockler arrived at the Burger King on Fort Hamilton Parkway and Dahill Road in Brooklyn and parked his vehicle in the lot. At approximately 12:57 P.M., he saw a 1976 maroon Oldsmobile Cutlass with two occupants enter from the Caton Avenue entrance. The passenger, whom Mockler identified in

court as Munoz, got out, walked toward Mockler's car, looked at Mockler, and walked slowly back to his car, while repeatedly glancing over his shoulder at Mockler. He then walked around the Burger King and looked at Mockler from the far corner nearest the Caton Avenue entrance. He returned to his car, spoke to the driver who looked in the rear view mirror at Mockler; then, both got out of the car and walked toward Burger King restaurant. At this point, Mockler noticed that the driver resembled a description of Jose Otero obtained from the Department of Motor Vehicles. Several minutes later they returned with food bags, again turning to look at Mockler as they got into their car. Mockler, who had by now been joined on the scene by Sergeant Toal in a separate vehicle, left the lot, turned right on Dahill Road, and parked his car several hundred yards away.

Munoz again got out of his car, walked to Caton Avenue, and, appearing very anxious, he looked up and down the streets at the approaching traffic. At this point, the driver, whom Mockler identified in court as Otero, backed the car to a position facing Dahill Road with an unobstructed view of both exits. Pursuant to Mockler's instruction, Detective Robinson, in a four-door yellow Chevy, arrived at this time through the Caton Avenue entrance, where he observed Munoz walking back and forth. Looking very nervous, Munoz then walked back to the Oldsmobile and seated himself in the front seat, at which time Otero moved the vehicle slowly toward the Caton Avenue exit. At this point, Sergeant Toal, Agent Mockler, and Detective Robinson converged their vehicles on the Oldsmobile, blocking its exit in both directions. When it stopped, Mockler displayed his badge and approached Munoz, who opened the door and began to walk away. When Mockler asked him his name, he stopped and answered "Nicholas." Mockler asked again, this time for his last name, and Munoz gave the same answer. At the same time, Detective Robinson approached Otero, displayed his badge, knocked on the window, and asked to see some identification, such as a driver's license or vehicle registration. Otero then got out of the car without having been asked to do so and handed Robinson a license in the name of Jose V. Otero. In response to a question from Mockler, Robinson gave him Otero's name and address, and Mockler advised him to place Otero under arrest. After positioning Munoz against the trunk of the Oldsmobile, Mockler peered into the vehicle and observed on the rear floor partially covered by a shirt a white shopping bag (Govt. Ex. 37) containing a brown paper bag with the top folded over and pieces of scotch tape attached. He took the bag from the seat, felt what seemed to be bundles of money, opened it, and found $212,000 in U.S. currency (Govt. Exs. 38, 38a-d). Agent Mockler then reached under the passenger seat and found a loaded .45 caliber automatic pistol (Govt. Ex. 40). After Mockler informed both Otero and Munoz that they were under arrest, they were frisked by Detective Robinson, who found a live round of .45 caliber ammunition (Govt. Ex. 42) in Munoz' pocket.

Munoz and Otero were then placed in Sergeant Toal's vehicle with Detective Robinson, and, followed by Mockler in the Oldsmobile Cutlass, they were driven by Toal to the Brooklyn South Narcotics Unit at the Prospect Park precinct in Brooklyn, where they arrived at 1:20 P.M. While in transit, Robinson advised Otero of his rights in English from DEA Form 13 (Govt. Ex. 43), and Otero stated that he understood. No attempt was made similarly to advise Munoz or to question him because Otero explained that Munoz spoke no English. While both were detained at the precinct, the three officers returned to the Burger King to await the expected arrival of "Willie," whose name appeared on the Ocampo meeting list opposite the time "2:00," although no place for the meeting was specified.

Since Willie had apparently not arrived by 2:05 P.M., the officers returned to the precinct, at which time Otero and Munoz were transported to the 70th precinct, on Lawrence Avenue in Brooklyn. After arriving between 2:00 and 3:00 P.M., both were

thoroughly searched by Detective Robinson, who took from Otero a wallet and various papers (Govt. Exs. 41, 41a).

Soon thereafter, the arrestees were taken to DEA headquarters on 57th Street in Manhattan, where they were placed in detention cells on the 18th floor. After again being informed of his *Miranda* rights, Otero stated that he understood them and made a statement to Detective Robinson explaining his presence at the Burger King. In substance, Otero stated that on January 31 he was driving along Woodhaven Boulevard looking for the movie "In Search of Historic Jesus," when he was waved down by Munoz who was carrying a shopping bag. Munoz told Otero that he would give $100 if he would take him to Brooklyn. Otero, who knew Munoz and had been helping him with learning English, agreed. Driving along the Prospect Parkway, Munoz said he was hungry so they stopped at a Burger King for some food. Initially, Munoz went in alone but when he came out and explained that he was having difficulty ordering the food, Otero went in also. Finally, Otero told Detective Robinson that Munoz would back him up because "he knows I'm innocent," and asked, "is it against the law to carry money?"

Munoz was interviewed for about 20 minutes by Detective Louis Ramos, New York City Police Department, at about 4:30 that afternoon at DEA headquarters. After Munoz was advised of his *Miranda* rights in Spanish from DEA Form 13 and had acknowledged his understanding of them,[5] Ramos filled out a DEA Form 202 for him. Munoz then explained that at a restaurant on 147th Street and Northern Boulevard he had met by chance an old acquaintance named Guillermo who asked him to take a shopping bag to Fort Hamilton, although Munoz did not know precisely where. He denied knowing anything about the money found in the bag, but stated that he knew it contained a gun. Finally, he stated that Otero had nothing to do with it. At the end of the interview, Munoz said he had no more to say and that he wanted a lawyer.

Later that evening, Mockler, Robinson, Guzman, and Toal met at Otero's home at 42–37 Hampton Street, apartment 2J, in Brooklyn, in order to verify the address, get a consent search, and obtain further information about Munoz. They let themselves into the apartment building by using one of the keys taken from Otero, went to the door of the apartment and knocked loudly for several minutes, got no answer, and then left the building. Upon learning from one of the agents that a woman had been seen at the window of the apartment, they returned, rang the bell, again knocked loudly on the door, and, after two to three minutes, heard a woman ask, "Who's there?" in English. Detective Robinson responded, "Police Officers" and held his shield up to the peephole. The woman, holding a young child, opened the door and identified herself as Nora Otero; the officers showed their shields, and Guzman said in Spanish, "We'd like to speak with you about your husband." She opened the door and showed the four officers into the living-dining room area where they were all seated at a table. When Detective Robinson informed her that her husband had been arrested for narcotics violations, she became very upset and began to cry. The officers then tried to calm her down, telling her that everything would be alright and explaining where and when an arraignment would be held. They then showed her a picture of Munoz and asked her if she knew him. She answered that she did, but did not know where he lived. They also asked her about her husband, who she said had been employed at the Brasserie Restaurant as a waiter and was now doing odd jobs. By this time, according to Detective Robinson, Mrs. Otero had calmed down.

The agents then asked her whether there were any guns or narcotics in the apartment, and she answered, "No," and told them they could look if they wished. When Agent Mockler asked her if she would sign a consent to search form, she agreed and, after Investigator Purpura had brought one

from the police vehicle and Agent Guzman had read it to her in Spanish and explained it, she said she understood and signed it (Govt. Ex. 44).[6] The agents then asked her to show them where his papers or documents could be found, and she showed them in the bedroom (1) a night-table and (2) a dresser, and in the kitchen, drawers with bills and housekeeping records. From the night-table, the agents seized an address book (Ex. 46) and, from the kitchen drawers, three large notebooks (Govt. Exs. 47–49), one of which contained several loose pieces of paper (Govt. Exs. 50, 51, 51a).

Mrs. Otero stated that these books belonged to her husband and that he was the only person who would write in them.

During the approximately one hour the agents were in the apartment, their weapons were neither drawn nor displayed. Although they looked around the apartment generally in addition to examining the places specifically pointed out by Mrs. Otero, they did not go through closets or pull out drawers. No attempt had apparently been made by the agents to get a warrant to search the apartment before going there.[7]

---

6. The consent to search form signed by Mrs. Nora Otero provides as follows:

> I, <u>Nora Otero</u> (signed), having been requested to consent to a search of my <u>42–37 HAMPTON ST. APT 2–J</u> (handwritten), located at <u>QUEENS N.Y.</u> (handwritten) and having been duly advised of my constitutional rights to (1) refuse such consent, (2) to require that a search warrant be obtained prior to any search, (3) that if I do consent to a search, any evidence found as a result of such search, can and will be used against me in any civil or criminal proceedings, (4) that I

> may consult with an attorney of my choosing before or during the search and (5) that I may withdraw my consent to search at any time prior to its conclusion.

> After having been advised of my constitutional rights, I hereby knowingly, intelligently and voluntarily waive my above rights and consent to a search and authorize <u>JOSE LUIS GUZMAN</u> (handwritten) and <u>WM F. MOCKLER</u> (handwritten), Special Agents of the Drug Enforcement Administration, United States Department of Justice, to conduct a complete search of the above described _____.

> | Nora Otero (signed) |
> | --- |
> | 9–35 P.M. 1–31–80 (handwritten) |
> | 42–37 HAMPTON ST. APT 2–J " |
> | ELMHURST. QUEENS " |

> Witnesses:
>
> Jose Luis Guzman (signed)
> William F. Mockler Jr. (signed)

---

7. The circumstances surrounding this warrantless search of defendant Otero's apartment were disputed, thus presenting the Court with an unavoidable question of credibility. For the reasons stated *infra* at 1237, the Court finds the testimony of Mrs. Nora Otero, defendant Otero's wife, incredible in several material respects. Her direct testimony can, however, be summarized as follows: At about 9:00 P.M. on January 31, 1980, Mrs. Otero heard hard knocking on the door of her apartment as she was putting her children to bed. Because she did not know who was at the door, she became frightened and did not answer. She then went to the window and observed several men leaving downstairs until they saw her in the window, at which time they again ran into the building. After several minutes more of loud knocking, she went to the door and asked in Spanish, "Que pasa?" The men answered, "It's the police; Open up."

After she had opened the door and identified herself, the officers informed her that her husband had been arrested, at which point she began to cry. They asked her if she spoke English, and she responded that she spoke very little. Agent Guzman then stated in Spanish that they would explain the circumstances of her husband's arrest if she would let them in. Although she did not invite them in, they entered and went into the dining room. Without asking her permission to do so, several agents searched the apartment. As she continued to cry, Guzman asked her questions about Munoz. Agent Mockler asked her if she had a green card and requested that she show it to him. As she went to the bedroom to get it, the agents followed. She showed them her passport, and they then asked where her husband kept his documents. When she pointed out a night table by the bed, they immediately searched it and seized a light blue telephone book. They then searched in the closet and found a receipt, which she explained was a pay stub from her husband's job at a Manhattan restaurant. After fifteen minutes in the bed-

### G. *Identification Testimony of Robert Rankin*

Several days prior to the arrests of Ocampo, Hernandez, and Cardona on January 28, 1980, Detective Robinson and several other officers questioned Robert Rankin, building superintendent at 23–35 Broadway in Astoria, Queens, concerning the occupants of apartment 3F at that address. Rankin described five persons, one of whom he characterized as "tall, thin, wavy hair, pock marks on the face, walked a little odd."

On the night of January 28, 1980, the same officers met Rankin outside a lounge in Queens at which time Detective Robinson showed him several photographs (Govt. Exs. 52, 52a, and 52b) and asked if he could recognize any of the persons pictured. Rankin identified only a picture of defendant Cardona (Govt. Ex. 52b) as one of the persons he had seen on several occasions in apartment 3F and in the vicinity of the building.

### LAW

Defendants seek to suppress all the evidence obtained directly or indirectly from the above described searches and seizures. With respect to those conducted without a warrant, suppression is sought on the ground that they were justified neither by probable cause to arrest nor any other recognized exception to the Fourth Amendment's warrant requirement, such as consent or search incident to a valid arrest. With respect to the search of 1440 Ocean Parkway, apartment 6C, in Brooklyn, suppression is sought on the ground that the affidavit in support of the search warrant failed to set forth sufficient probable cause for its issuance and contained false and misleading information without which probable cause could not have been found by the magistrate. In addition, several of the defendants contend that certain statements or admissions made by them after their arrests are inadmissible either under the principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or as "fruits" of an illegal arrest. Finally, defendant Cardona seeks also to suppress the photographic and in-court identifications of him by Robert Rankin, building superintendent at 23–35 Broadway in Astoria, Queens, as the "fruit" of his unlawful arrest.

### A. *General Principles*

The fundamental tenet of the law of search and seizure is the Fourth Amendment to the Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This language has been construed to bar warrantless searches or seizures unless justified by one of the recognized exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970). The Government bears the burden of proof that such circumstances existed or such exceptions were applicable by a preponderance of the credible evidence when it seeks to validate a

---

room, they returned to the dining area. A heavy-set agent went into the kitchen, found various documents, and called Mockler to look at them. When they asked her to explain the symbols appearing on the documents, she stated that she didn't know what they meant. The heavy-set man then went again into the bedroom, this time with Nora Otero's young daughter. Moments later, he returned laughing, stating that the girl was very funny.

Guzman then presented her with a form which he explained was a receipt for articles seized, and she signed just prior to the agents' departure, 45 minutes after their arrival. She was unable to read the form in English, and it was never read to her in Spanish.

On cross-examination, Mrs. Otero stated that she cried continually during and after the officers' search, and she testified at length concerning her inability to speak, read, or understand English. She also described her educational background, her work, and such household duties as shopping and banking.

warrantless search or seizure. *Id.; Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969); *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 996 n.14, 39 L.Ed.2d 242 (1974); *United States v. Isom*, 588 F.2d 858, 861 (2d Cir. 1978). When a search is based upon a warrant, the supporting affidavits presented to the magistrate "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 114–15, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). The burden of proof is on the moving party to establish by a preponderance of the credible evidence "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit and [that] the allegedly false statement is necessary to the finding of probable cause . . . ." *Franks v. Delaware*, 438 U.S. at 155–56, 98 S.Ct. at 2677. Finally, the moving party also bears the burden of establishing that the searches and seizures in question, whether or not conducted pursuant to a warrant, violated that individual's personal constitutional rights. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, 99 S.Ct. 421, 423 n.1, 58 L.Ed.2d 387 (1978); *Simmons v. United States*, 390 U.S. 377, 391, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968); *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 695 (1960).

B. *Arrests of Daniel Ocampo, Theodoro Hernandez, Carlos Cardona, Jose Vincente Otero, and Nicholas Antonio Munoz-Velasquez*

As described *supra*, defendants were arrested shortly after their vehicles were stopped by members of the DEA Task Force Group 5—Ocampo, Hernandez, and Cardona on January 28, 1980 at Fifth Avenue and Fifteenth Street in Brooklyn, and Otero and Munoz on January 31, 1980 in the lot of Burger King Restaurant at the corner of Dahill Road and Caton Avenue, also in Brooklyn. Each defendant now challenges the legality of his stop and arrest and contends that evidence derived therefrom must be suppressed. The Government argues, on the other hand, that probable cause to arrest each defendant existed at the time the vehicles were stopped or, in the alternative, the facts known to and events observed by Group 5 members reasonably warranted an investigative stop of defendants and that their suspicions matured into probable cause upon discovery of evidence in the vehicles.

It is well settled in this circuit that "probable cause to arrest exists when an officer has knowledge of facts and circumstances 'sufficient to warrant a prudent man in believing' that an offense is being or has been committed [by the persons to be arrested]." *United States v. Agapito*, 620 F.2d 324, 332 (2d Cir. 1980); *United States v. Rueda*, 549 F.2d 865, 870 (2d Cir. 1977); *Dunaway v. New York*, 442 U.S. 200, 208 n.9, 99 S.Ct. 2248, 2254 n.9, 60 L.Ed.2d 824 (1979); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). Recently, in *United States v. Webb*, 623 F.2d 758, 761–762 (2d Cir. 1980), the Court of Appeals for this circuit elaborated on this standard, stating:

The essence of probable cause is a reasonable, objective basis for *belief* in a suspect's guilt, although not necessarily *proof* of guilt beyond a reasonable doubt. While the rule prohibiting law enforcement officers from making arrests without probable cause serves to protect the public from harassment or arbitrary police actions, the rule also must serve the concomitant interest of allowing the police to enforce the law without undue restraints. [Cit. omit.] As such, probable cause to arrest is not limited to those instances where the arresting officer has acquired evidence which would be sufficient to convict the suspect at trial. [Cit. omit.] Similarly, facts ostensibly suffi-

cient to establish probable cause for an arrest are not negated simply because such facts also may be consistent with the suspect's innocence. [Cit. omit.]

In short, while the rule of probable cause does impose a requirement on police to act with more than mere suspicion of wrongdoing, the rule also gives police a permit to act with less than absolute certainty of guilt. "In dealing with probable cause . . . we deal with probabilities." [Cit. omit.] [Emphasis in original.]

A search or seizure must, however, be supported by probable cause with respect to the person or object in question, and "[t]his requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979); *Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).

With this background, we proceed to consider the evidence offered to justify the arrests of defendants here.

### 1. *Daniel Ocampo*

■■ The Court is convinced that at the time Ocampo's vehicle was stopped on January 28 the officers had knowledge of facts and circumstances more than sufficient to warrant a prudent man in believing that Ocampo was committing a narcotics offense. First, Group 5 had information connecting Ocampo to the Patino narcotics organization, specifically the repeated appearance in code of his name and telephone number on documents taken from Patino and Pulgarin, both targets of a large scale investigation of Colombian narcotics activities, and pen register records showing calls from the phone of Tulio Enrique Ayerbe, a suspected member of the Patino organization, and Ocampo. Such knowledge of a suspect's association with known narcotics dealers is an important, although not dispositive, factor to be considered in determining probable cause to arrest. *United*

*States v. Tramunti*, 513 F.2d 1087, 1101 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Solis*, 469 F.2d 1113, 1115 (5th Cir. 1972), *cert. denied*, 410 U.S. 932, 93 S.Ct. 1375, 35 L.Ed.2d 594 (1973).

Second, on one of the documents taken from Pulgarin the name "Daniel" appeared opposite figures indicating that Ocampo was himself involved in the purchase and sale of narcotics. A check of DEA files revealed that (1) in 1971 Ocampo was a suspected cocaine dealer; (2) he had been arrested with a quantity of cocaine by Customs Police as he was boarding a United States bound ship in Colombia in 1971; and (3) an informant of unknown reliability had stated that Ocampo was involved in cocaine distribution in Brooklyn. The file also provided a brief description of Ocampo's physical characteristics.

Third, surveillance of his 55th Street address on January 22, 1980 resulted in the arrest of Vasquez and Ibarguan after Vasquez was seen emerging from the building and proceeding to another location from which he carried a yellow shopping bag which later was found to contain $27,500 in cash and several bags of cocaine. Further indications of Ocampo's participation in those activities were the repeated appearances of Mrs. Ocampo in front of the building prior to Vasquez' arrival and pen register records showing seven calls from Ocampo's phone to Vasquez' apartment at 104–40 Queens Boulevard in Rego Park, all dialed between 9:20 P.M. and 11:35 P.M., only a few hours after Vasquez' arrest.

Fourth, investigation of Ocampo's 1440 Ocean Parkway apartment provided substantial basis to believe that it was used as a "stash pad" for tools of the drug trade. Heavy curtains and drapes on the windows, sporadic visits to the apartment at unusual hours by well-dressed South American men carrying suitcases, boxes, or other packages, and two neighbors' observation that they did not think anyone lived there—all these were relevant factors in determining Ocampo's involvement in narcotics trafficking. A description of one of the visitors provided

by the neighbors closely resembled the description of Ocampo drawn from DEA files.

Finally, the observations of the arresting officers on January 28, recounted at length *supra*, constitute a clearly sufficient basis for probable cause when considered in the context just described. While surveilling 1440 Ocean Parkway, Officer Prakin observed and followed a man fitting Ocampo's description who, using a key, entered the apartment on two occasions, delivered a brown paper bag, and left carrying a blue and white flight bag. Stopping briefly at Ocampo's other known address—1401 55th Street—he picked up and placed in the car trunk a brown box. Shortly thereafter at the Burger King, this individual—whom Prakin "believed" to be Ocampo—appeared nervous, pretended to make a phone call, exchanged a wave with Hernandez as he entered the lot, and then waited ten minutes before joining him at a table. When they returned to their vehicles, they did so by separate routes, and then proceeded out of the lot together. As they proceeded away from the Burger King on a suspicious itinerary, the passenger in the second car repeatedly turned around to look out the rear window, and both cars drove in an evasive manner, suggesting that they hoped either to detect or evade surveillance. Similar suspicious behavior, nervousness, and planned separation have been noted as relevant articulable facts by other courts on an issue involving suspicion of criminal conduct. *United States v. Oates*, 560 F.2d 45, 57 (2d Cir. 1977); *United States v. Tramunti*, 513 F.2d at 1103–04; *United States v. Vasquez-Santiago*, 602 F.2d 1069, 1072 (2d Cir. 1979); *United States v. Rico*, 594 F.2d 320, 325–26 (2d Cir. 1979); *United States v. Price*, 599 F.2d 494, 500 (2d Cir. 1979).

Viewing this evidence as a whole as we are required to do, *United States v. Webb*, *supra*, at 762, we find that at the time Ocampo's vehicle was stopped by Group 5 members at Fifth Avenue and Fifteenth Street in Brooklyn, the officers had knowledge of facts which strongly support the inference that he was involved in a narcotics transaction and, accordingly, that his arrest was based on probable cause.

### 2. *Theodoro Hernandez*

██ The Government offers two separate theories in support of its contention that probable cause existed to arrest Hernandez at the time his vehicle was stopped on January 28: first, as a narcotics offender, and second, as an INS fugitive for whom an arrest warrant was outstanding. As to both theories, the Court agrees.

Like Ocampo, Hernandez was no stranger to Group 5 when he appeared at the Burger King to meet Ocampo. In October 1978, he was arrested on a narcotics charge with three other suspected members of the Patino network, and seizures were made contemporaneously of $127,000 in cash, five pounds of cocaine, guns, and books and records evidencing large scale cocaine dealings. When federal prosecution was declined, Hernandez was released to the INS as an illegal alien. Group 5 was subsequently informed that, although a deportation hearing had been scheduled, Hernandez had forfeited a $6,000 bond by failing to appear and that a warrant for his arrest had been issued.

Based on a tip from a reliable informant, Group 5 also knew Hernandez as a Patino customer named "Negro." This name appeared on several significant documents: (1) those taken from Patino at the time of his arrest (the phone number for 23–35 Broadway, apartment 3F, appeared next to his name); and (2) documents found at 1785 215th Place in Bayside, Queens (an apartment for which Patino carried rent receipts), which evidenced cocaine transactions between Patino and Negro and listed debits in Negro's name for attorney's fees ("10.000") and a bond ("6.000"). Group 5 members could reasonably infer from this latter document that Patino posted the INS bond which Hernandez forfeited in 1978 by failing to appear for his hearing.

██ Against this background of information, the arresting officers were justified in concluding that Hernandez' meeting with Ocampo at the Burger King on January 28 was more than an innocent coincidence.

Detective Robinson's recognition of Hernandez during the momentary traffic jam as the suspect vehicles were leaving the lot provided a significant clue as to the purpose of the meeting, and that clue added to their suspicion of criminal activity. Based upon their certainty of Hernandez' identity, their familiarity with his record, and their observation of all of the suspicious circumstances surrounding the Burger King meeting which were discussed *supra* with respect to Ocampo's arrest, the arresting officers properly concluded that they had probable cause to arrest Hernandez.[8]

■ The Court believes also that Hernandez' detention or arrest was proper based on either (1) the outstanding warrant for his arrest as an INS fugitive or (2) probable cause to believe that he was in the United States illegally. *See* 8 U.S.C. § 1357(a)(2). Although Hernandez now contends that no warrant for his arrest was ever issued following his failure to appear at his deportation hearing, the INS Form 221S was produced during the course of this suppression hearing to demonstrate the existence of such a warrant. Even without the warrant, however, the officers had probable cause to believe that Hernandez was in this country illegally based on reliable information from the INS that he had failed to appear for his hearing and had forfeited a $6,000 bond. *See Salgado v. Scannel*, 561 F.2d 1211, 1212 (5th Cir. 1977); *Ojeda-Vinales v. Immigration and Naturalization Service*, 523 F.2d 286, 288 (2d Cir. 1975); *United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979). Thus, their decision to detain Hernandez pending arrival of Immigration authorities was not improper.

**3. *Carlos Cardona***

■ The Government concedes that prior to his appearance at the Burger King

on January 28 with Hernandez, its agents had never seen or heard of Carlos Cardona. In support of its contention that probable cause existed for his arrest at the time of the stop, the Government relies primarily upon three principal circumstances: (1) his presence in Hernandez' vehicle; (2) the observations of Group 5 members that during the course of the drive away from the Burger King and prior to the stop at Fifth Avenue and Fifteenth Street in Brooklyn, Cardona turned around repeatedly to look through the rear window; and (3) Investigator Purpura's observation, after Hernandez was removed from the car with the engine still running, of Cardona sliding to the left on the front seat with his hand on the steering wheel.

In our view, these circumstances were insufficient to give rise to probable cause for his arrest. As stated *supra*, the mere presence of an individual in the company of another for whom there exists probable cause to arrest does not obviate the necessity for a particularized finding of probable cause as to the first individual. *Ybarra v. Illinois*, 444 U.S. at 90, 100 S.Ct. at 342; *Sibron v. New York*, 392 U.S. at 62, 88 S.Ct. at 1902; *United States v. DiRe*, 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1947); *United States v. Wright*, 577 F.2d 378, 380 (6th Cir. 1978); *United States v. Rosario*, 543 F.2d 6, 8–9 (2d Cir. 1976); *United States v. Bazinet*, 462 F.2d 982, 988–89 (8th Cir.), *cert. denied*, 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972); *United States v. Mesa-Valencia*, Memo.Dec. at 43–44 (E.D.N.Y. Feb. 2, 1980). In *United States v. DiRe, supra*, the Supreme Court explicitly rejected the contention that a person found in the vicinity of suspected criminal activity cannot be presumed innocent:

8. We reject defendant Hernandez' contention that Detective Robinson's recognition of him as he left the Burger King lot must be excluded from consideration in determining probable cause because it is the "fruit" of Hernandez' unlawful arrest in 1978. First, there is absolutely no evidence that the 1978 arrest of Hernandez was in fact illegal. Second, even if we were to assume that it was unlawful, the notion

that a defendant's face can be a suppressible "fruit" of a Fourth Amendment violation was recently rejected by five members of the Supreme Court in *United States v. Crews*, —— U.S. ——, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1979). Robinson's recognition of Hernandez could properly be considered by the arresting officers in determining probable cause.

An inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case. The argument that one who "accompanies a criminal to a crime rendezvous" cannot be assumed to be a bystander, forceful enough in some circumstances, is far-fetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal . . . Presumptions of guilt are not lightly to be indulged in from mere meetings.

332 U.S. at 593, 68 S.Ct. at 228. The additional suspicious circumstances involving Cardona cited by the Government do not, in our view, reach the level necessary to validate the arrest, particularly in view of the fact that Cardona did not even attend the meeting between Ocampo and Hernandez but at all times remained seated in Hernandez' car. Accordingly, considering all the circumstances as they existed at the time of the stop, we conclude that the officers did not have probable cause for Cardona's arrest.

The Government contends in the alternative, however, that sufficient basis existed to conduct an investigative stop of Cardona in order to obtain identification and ask a limited number of questions, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Under this theory, the Government reasons that once Cardona was stopped and taken from the vehicle additional facts quickly developed which matured reasonable suspicion into probable cause for his arrest. Specifically, the Government relies upon the discovery of money on the rear floor of the vehicle.[9]

 While the officers may indeed have had sufficient grounds for the investigative stops permitted in *Terry* and *Adams*, the stop which occurred here was clearly inconsistent with the limited intrusion contemplated by those decisions. *Terry v. Ohio, supra*, involved a brief, on-the-street stop and frisk for weapons and recognized an exception to the requirement that Fourth Amendment seizures must be based on probable cause. Subsequent cases have defined more precisely the parameters of this exception in other contexts and have established the general principle that given specific and articulable facts which reasonably warrant suspicion of criminal conduct on the part of specific individuals, an investigating officer may question them about their identities and even ask that they explain suspicious circumstances. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. at 145–46, 92 S.Ct. at 1923; *Dunaway v. New York*, 442 U.S. at 209–213, 99 S.Ct. at 2255–56; *United States v. Vasquez-Santiago*, 602 F.2d at 1072; *United States v. Price*, 599 F.2d at 499; *United States v. Wright*, 565 F.2d 486, 488–89 (8th Cir. 1977), *cert. denied*, 435 U.S. 974, 98 S.Ct. 1621, 56 L.Ed.2d 67 (1978). In *United States v. Price, supra*, the Second Circuit Court of Appeals described a balancing test to be applied and emphasized the importance of the scope of the intrusion:

> Where the articulable facts observed are suspicious yet fall short of probable cause, the reasonableness of a particular stop must be gauged by comparing the degree of the intrusion with the grounds for the suspicion that intrusion is called for. "[T]he scope of the particular intrusion, in light of all the exigencies of the case, [should be] a central element in the analysis of reasonableness." *Terry v. Ohio, supra*, 392 U.S. at 18 n.15, 88 S.Ct. at 1875.

599 F.2d at 499.

The Government urges that the severity of the offense suspected—narcotics trafficking—and the consequences of delay on the part of the officers—possible escape by the suspects—are two factors weighing heavily in support of the officers' conduct here. We do not believe, however, that the

---

9. The legality of this search is discussed *infra* at 1232–1234.

actions of Officer Prakin and Investigator Purpura in this case—namely, an armed approach to a surrounded vehicle, removal of the occupants at gunpoint from the front seat to the hood of the car, spreading of the occupants over the hood while the gun remained trained on their backs, and a frisk for weapons—can properly be reconciled with the narrow exception to the probable cause requirement established in order to facilitate the government's investigation of criminal activity. No questions were asked, no identification was sought, and the degree of restraint imposed was only slightly increased by the handcuffing of Hernandez and Cardona after discovery of the money and before placing them in the police vehicle. Under the circumstances of this case, the Court considers it necessary to hold the line against what Justice Douglas, in his dissenting opinion in *Terry*, called the "powerful hydraulic pressures . . . that bear heavily on the Court to water down constitutional guarantees and give the police the upper hand." 392 U.S. at 39, 88 S.Ct. at 1889. Thus, we conclude that the arrest of Cardona was complete when the occupants were removed from their vehicle at gunpoint. *See United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974); *United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975); *United States v. Oates*, 560 F.2d at 57; *United States v. Lampkin*, 464 F.2d 1093, 1095 (3d Cir. 1972).

Since Cardona was arrested prior to discovery of the bundles of currency, that evidence cannot be considered in determining the existence of probable cause for his arrest. We conclude, therefore, that his arrest was unlawful.

4. *Jose Vincente Otero and Nicholas Antonio Munoz-Velasquez*

At the time the maroon Oldsmobile Cutlass was stopped in the lot of the Burger

King on January 31, 1980, the name of Jose V. Otero was known to Group 5 from four sources: (1) the Patino telephone and address book, in which the name "Vicente" appeared next to the coded telephone number of Jose V. Otero, address 42–37 Hampton Street, Elmhurst; (2) documents seized from Ocampo at the time of his arrest, listing seventeen meetings, most with dates and locations, of which one was to involve a person named "Vic" and to take place at "BK" (Burger King) at 1:00 o'clock, probably on January 31; (3) a customer list also seized from Ocampo and listing next to "Vic" a number which, when decoded, was discovered to be that of Jose V. Otero; and (4) a brief description of Otero provided by the Department of Motor Vehicles as 32 years old and 5 feet 7 inches tall. With respect to Munoz, Group 5 knew nothing.

Group 5 members were not at the Burger King on January 31 by mere chance. Because of the information gleaned from the list of meetings taken from Ocampo,[10] the agents had good reason to expect not only that a meeting similar to that observed between Ocampo and Hernandez on January 28 would take place at 1:00 P.M., but that Jose Otero would be one of the participants. Three minutes before the time scheduled for the meeting, Otero and Munoz drove into the lot. Although Group 5 could not be certain that these were the expected conspirators, the behavior of Otero and Munoz during the period between their arrival and the stop of their vehicle by the officers provided a specific and articulable basis for belief that they were. After Otero parked the car in the same spot used by Ocampo three days before, Munoz got out, walked toward Agent Mockler's car, turned abruptly around, and walked the

---

**10.** The documents seized from Ocampo after his arrest listed one meeting as "Grone—Lunes 7:00 P.M. BK." Reversing the syllables of "Grone," Agent Mockler inferred that this was the Burger King meeting held on Monday, January 28, 1980, at 7:00 P.M., between Ocampo and Negro, or Hernandez. Based on the evidence discovered in the Ocampo and Hernandez vehicles after that meeting, Mockler rea-

sonably believed that the other meetings listed might have similar purposes, and, accordingly, he assigned surveillance teams at the times and places those meetings were expected to occur. His presence and that of other agents at the Burger King on Dahill Road and Caton Avenue in Brooklyn on January 31 at 1:00 P.M. stemmed from this analysis of the Ocampo documents.

other way while at the same time looking repeatedly over his shoulder in Mockler's direction. He proceeded around the restaurant, peered at Mockler's car from the opposite side of the building, returned to his car, and said something to Otero. After Otero looked in his rear view mirror, both got out of the car and entered the restaurant, at which time Mockler noticed that the driver resembled the description of Jose Otero obtained from the Department of Motor Vehicles. Moments later, they returned to their car with food, again glancing in Mockler's direction. After Munoz again got out, walked to Caton Avenue, and began pacing nervously back and forth as if expecting the arrival of another vehicle, Otero moved his car backward to a position from which he had a clear view of both entrances to the lot. Just after Detective Robinson entered the lot in his car, Munoz walked back to the maroon Oldsmobile, and as soon as he had seated himself on the passenger side of the front seat, Otero moved the car toward the Caton Avenue exit.

■ At this point, the officers had a justifiable and reasonable suspicion that criminal activity was afoot and that the suspects were leaving the scene, and, thus, their stop of the car was proper. *Terry v. Ohio, supra; Adams v. Williams, supra; United States v. Price, supra.* Without guns drawn or any show of force beyond the blocking of the exit with their own vehicles, Detective Robinson and Agent Mockler approached the Oldsmobile and asked both occupants for identification. Munoz got out and started to walk away, but stopped when Mockler asked his name. When Robinson informed Mockler that the driver's name was Jose Otero, Mockler told him to make the arrest. Mockler then looked into the vehicle, found a shopping bag containing a bag of bundled currency on the rear floor behind the driver's seat, and, reaching under the front seat on the passenger's side, discovered a loaded .45 caliber automatic pistol.[11]

The exact moment of arrest of Otero and Munoz is a matter of some dispute. However, even assuming that Otero was arrested by Detective Robinson at the time he was instructed to do so by Agent Mockler— and it seems reasonable to conclude, based on the evidence, that he was—we believe that that arrest was supported by sufficient facts to constitute probable cause. *United States v. Oates*, 560 F.2d at 57.

We believe also that, considering the circumstances recounted above, the officers had probable cause to arrest Munoz at that time as well. In contrast to their suspicions of criminal activity at the time Cardona was arrested, the agents had a reasonably clear idea, based on Ocampo's list of meetings, where and when a meeting was to take place, what the purpose of that meeting would be, and what kinds of evidence— e. g., large amounts of money—were likely to be found. Moreover, unlike Cardona, Munoz appeared to play an active role in the events, which, judging from his nervous demeanor he seemed to realize were of a clandestine nature. In short, he was no mere bystander. *United States v. DiRe*, 332 U.S. at 593, 68 S.Ct. at 228. Together with these facts, his presence in the vehicle with Otero was clearly relevant to the officers' decision to arrest him. *See United States v. Tramunti*, 513 F.2d at 1101–04.

■ However, a more likely view of the evidence, which view the Court adopts, is that Munoz was not arrested until after the articles had been seized from the vehicle. Although Munoz was clearly not free to go from the moment the Oldsmobile was stopped, the officers never drew their guns, they asked for identification, and the detention was brief in duration. Under the standard enunciated in *United States v. Price* and quoted *supra*, we conclude that the grounds for suspicion present here justified the limited intrusion occasioned by the detention of Munoz until the discovery of the money and the gun in the car made the existence of probable cause for his arrest indisputable. The subsequent frisk by Detective Robinson of both Otero and Munoz was clearly justified, and Munoz' motion to

---

11. The legality of this car search is discussed *infra* at 1234–1235.

suppress the live round of ammunition found in his pocket is denied.

## C. *Auto Searches*

### 1. *Search of Ocampo and Hernandez Vehicles*

Defendants Hernandez and Cardona seek to suppress the bags of money found on the rear floor of their vehicle at the time of their arrest, and defendant Ocampo seeks to suppress the blue and white flight bag and its contents and the cardboard box of inositol seized from the front seat and trunk of his vehicle, respectively. The Government seeks to justify the seizures as follows: (1) the bags of money under the "plain view" exception; (2) the flight bag and its contents as a search incident to a valid arrest; and (3) the box of inositol as either an inventory search or within the auto search exception established by *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

A warrantless search and seizure of an object can be justified under the "plain view" doctrine if, at the time of the observation, the officer is lawfully on the premises, the discovery is inadvertent, and the incriminating nature of the object is immediately apparent. *Coolidge v. New Hampshire,* 403 U.S. at 465–74, 91 S.Ct. at 2037–2042; *United States v. Diaz,* 577 F.2d 821, 823 (2d Cir. 1978). In this case, each of these requirements is met with respect to the discovery of the open bag of currency in the rear of the Hernandez vehicle, and, contrary to defendants' contention, the fact that Officer Prakin utilized a flashlight to view the interior of the vehicle at night does not preclude applicability of the doctrine. *United States v. Lara,* 517 F.2d 209, 211 (5th Cir. 1975); *United States v. Arre-*

*dondo-Hernandez,* 574 F.2d 1312, 1314–15 (5th Cir. 1978). As to the second bag, the top of which was covered by a single piece of paper, its proximity to the open bag and the similarity of its size, appearance, and weight bring it within the "plain view" exception as well. *United States v. Diaz,* 577 F.2d at 824. In view of the facts recounted at length *supra,* this search can also be upheld as an auto search where there is probable cause to believe that the vehicle contains evidence of a crime. *Carroll v. United States, supra; Chambers v. Maroney, supra; United States v. Dien,* 609 F.2d 1038, 1044 (2d Cir. 1979). Both the location of the bag and the flimsy and insecure nature of its covering belie defendants' claim to a reasonable expectation of privacy in its contents, and, therefore, the doctrine of *Sanders v. Arkansas,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), is inapplicable. *United States v. Ross,* 27 Cr.L. 2169 (D.C.Cir. April 17, 1980).[12] The search of neither bag was unlawful, and, therefore, the contents are admissible insofar as they are relevant against all defendants.[13]

At the moment the blue and white flight bag was taken from the middle of the front seat of the Ocampo vehicle, Ocampo was standing in the open door, within an arm's reach of the bag. Under the doctrine of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), it could properly be searched as incident to a lawful arrest in order to secure any weapons and protect potential evidence. *United States v. Robinson,* 414 U.S. 218, 225, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973); *United States v. Riggs,* 474 F.2d 699, 702 (2d Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). Ocampo's contention here, based on *Sanders v. Arkansas, supra,* that a warrant was necessary before

---

**12.** *See* note 15 *infra.*

**13.** Our finding *supra* that defendant Cardona's arrest was unlawful does not require suppression of the bags found in the vehicle in which he was riding. Because both the stop of the vehicle to arrest Hernandez and the ensuing search of the car's interior were proper, the discovery of the bags of currency resulted not

from Cardona's illegal arrest but from a source independent of the constitutional violation, and, accordingly, that evidence is not "fruit of the poisoned tree." *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *United States v. Crews,* 445 U.S. at 469, 100 S.Ct. at 1249.

it and the brown shoulder bag contained in it could be searched is without merit because the evidence is undisputed that both bags were open and unsecured. Assuming, therefore, that the holding in *Sanders* can be extended to cover unlocked flight and shoulder bags, Ocampo's expectation of privacy in their contents was insufficient to necessitate a warrant prior to their search. *United States v. Milhollan,* 599 F.2d 518, 526–27 (3d Cir. 1979); *United States v. Garcia,* 605 F.2d 349, 356 (7th Cir. 1979). Ocampo's motion to suppress the bags and their contents is denied.

The box of inositol seized from the trunk presents a more difficult question. In *Sanders v. Arkansas, supra,* the Court held that the "automobile exception" to the warrant requirement did not encompass the search of a personal suitcase found in and seized from a vehicle even though the police had probable cause to believe that the suitcase contained marijuana. The Court concluded, therefore, that where the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and seized his suitcase—even if from an auto— they should delay the search thereof until after a warrant has been obtained. 99 S.Ct. at 2594.[14]

Applying this holding in *United States v. Dien, supra,* the Court of Appeals for the Second Circuit recently held unlawful the warrantless search of cardboard cartons found in a van because "like personal luggage there is no difference, in terms of mobility or expectation of privacy, between cardboard boxes taken from an automobile and cardboard boxes taken from other locations." *Id.,* at 1045.

We believe these decisions are controlling here. Although perhaps not as sturdy as a locked suitcase, the taped box placed by Ocampo in the trunk of his car surely evidenced an expectation of privacy by him as to its contents. Notwithstanding the existence of probable cause to believe that the box contained contraband, Officer Prakin had no legal justification for failing to obtain a warrant prior to opening it. Nor do we find persuasive the Government's alternative rationale for the search as a valid inventory because whatever legitimate governmental interest is served by an inventory search could have been satisfied here by simply inventorying the taped box as a single unit. *United States v. Bloomfield,* 594 F.2d 1200, 1202 (8th Cir. 1979). Accordingly, Ocampo's motion to suppress the box of inositol is granted.

### 2. Search of Otero Vehicle

After instructing Detective Robinson to arrest Otero, Agent Mockler looked in the vehicle and observed, partially covered by a shirt, a plastic shopping bag containing a brown paper bag. Reaching into the vehicle, he felt the brown bag and concluded that it contained bundles of currency. Mockler then opened the paper bag, ripping it slightly, and seized the currency. Under the front seat on the passenger's side he found a loaded .45 caliber automatic pistol. The seizure of both the gun and the bag was proper under the principles of *Carroll v. United States, supra,* and *Chambers v. Maroney, supra,* discussed above.

Defendants Otero and Munoz contend, however, that the search of the brown bag itself and the seizure of its contents were

14. With respect to containers other than personal luggage, the Court in *Sanders* stated:

Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain

view," thereby obviating the need for a warrant. [Cit. omit.] There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.
*Id.* 442 U.S. at 763 n. 13, 99 S.Ct. at 2593 n. 13.

improper because without a warrant, citing *Sanders v. Arkansas, supra.* We disagree. First, whatever legitimate expectation of privacy either might have had in the contents of the bag was undoubtedly diminished by the fact that they were wrapped in nothing more substantial than a paper bag with pieces of scotch tape attached and placed on the floor of the passenger compartment of the vehicle. As stated with respect to the bags found in the Hernandez vehicle, we believe that the necessity of obtaining a warrant to search the paper bag was obviated under the circumstances here. *United States v. Ross, supra.*[15] Nor is this conclusion altered by the fact that the shopping bag was partially covered by a shirt. Second, the seizure of the currency can be justified also under the "plain view" doctrine because the currency was within his reach and perceptible to Agent Mockler's touch. *United States v. Diaz,* 577 F.2d at 824. On either ground, therefore, we conclude that the bags of currency and the automatic pistol were lawfully seized.

D. *Search of 1440 Ocean Parkway, Apartment 6C*

Defendant Ocampo challenges the sufficiency of the warrant obtained to search his apartment at 1440 Ocean Parkway on January 29, 1980 and seeks to suppress all objects seized as a result of the search, including a small amount of cocaine, $100,000 in United States currency, three handguns, assorted ammunition, and miscellaneous books and records evidencing multi-million dollar cocaine transactions. Specifically, Ocampo asserts that (1) the affidavit in support of the search warrant was insufficient to show probable cause to believe narcotics would be found in the apartment; (2) the affidavit contained false and misleading information without which the probable cause could not have been found by the magistrate, and (3) the conclusion of probable cause rested entirely upon information or evidence obtained illegally.

 The definition of probable cause is the same whether the context is a search or an arrest. *Spinelli v. United States,* 393 U.S. 410, 417 n.5, 89 S.Ct. 584, 589 n.5, 21 L.Ed.2d 637 (1969). Thus, probable cause exists for the issuance of a search warrant when the facts and circumstances detailed in the supporting affidavit would warrant a man of reasonable caution in the belief that the items to be seized were located in the place to be searched. *Brinegar v. United States, supra; United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970).

 The five-page affidavit sworn to by Agent Mockler in this case contained without any doubt sufficient facts and circumstances to warrant a finding of probable cause. In addition to detailing substantial

---

**15.** Recently, the Court of Appeals for the District of Columbia held in *United States v. Ross,* 27 Cr.L. 2169 (D.C.Cir. April 17, 1980), that a defendant "could not reasonably harbor an expectation of privacy" in a paper bag discovered by police during the lawful search of the trunk of his car and, therefore, that suppression of the contents of the bag was not required. In reaching its conclusion, the court reasoned:

Paper bags differ from personal luggage in two material respects. * * * First, paper bags offer at best only minimal protection against accidental and deliberate intrusions. A paper bag can fall open or break very easily. It presents no real obstacles to invasions by the curious or the dishonest once it has left its owner's actual possession. Because it is neither so secure nor so permanent as typical forms of luggage, its contents are much more likely to become subject to public display than if the same items had been stored in luggage. Thus, it is doubtful that one realistically can expect a paper bag to remain closed or intact, its contents unrevealed, at least if it has left its owner's hands. * * *

Second, paper bags are not inevitably associated with the expectation of privacy. * * * Although a paper bag may be pressed into service as a repository of personal effects, we do not believe a reasonable man would identify a paper bag as a normal place to entrust his intimate personal possessions. In contrast, luggage in general serves to carry clothes, toiletries, and other items associated with day-to-day living. Luggage generally functions as a portable closet and chest of drawers; it follows that a person could justifiably maintain a substantially higher expectation of privacy in his personal luggage than in a paper bag.
*Id.* 27 Cr.L. at 2170.

background concerning the investigation by Group 5 of the Patino organization, Agent Mockler described the connection of Ocampo and Hernandez to Patino, the characteristics of other suspected "stash pads" in which numerous narcotics-related articles were found, the characteristics of 1440 Ocean Parkway, apartment 6C, which suggested to Mockler that it too might be a "stash pad," and the information drawn from DEA files concerning Ocampo's record. Mockler also recounted in detail the surveillance of the apartment conducted on January 28 and the subsequent arrests of Ocampo, Hernandez, and Cardona and the searches of their vehicles. Based upon these representations, issuance of the warrant was proper.

■■■ Ocampo's second and third contentions are equally meritless. Because he has failed to show the existence of any willfully false or reckless statements—much less any such statements sufficiently material to undercut the finding of probable cause—the Court need not probe beyond the four corners of the affidavit. *Franks v. Delaware*, 438 U.S. at 155–56, 98 S.Ct. at 2677. At best, Ocampo was able to demonstrate only minor discrepancies of a semantic nature. *See United States v. Jackstadt and Tourville*, 617 F.2d 12, 14 (2d Cir. 1980). Finally, because the reference to the box of inositol found in the trunk of Ocampo's vehicle constituted only a small part of the affidavit presented to the magistrate, the validity of the warrant is not affected by the determination *supra* that the box was unlawfully searched. *Howell v. Cupp*, 427 F.2d 36, 38 (9th Cir. 1970); *United States v. Harper*, 419 F.Supp. 951, 955 (D.C.Md.1976). Thus, defendant Ocampo's motion to suppress the articles seized from his apartment at 1440 Ocean Parkway is in all respects denied.

E. *Search of 42–37 Hampton Street, Apartment 2J, Elmhurst*

■■■ The Government seeks to justify the search of defendant Otero's apartment at 42–37 Hampton Street in Elmhurst as pursuant to a validly obtained consent of his wife, Nora Otero. It is well settled that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043 (1973); *United States v. Price*, 599 F.2d at 503. Whether the Government has met its burden of showing that a consent was "freely and voluntarily given" is a question to be determined from the totality of all the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. at 227, 93 S.Ct. at 2047–48, and mere acquiescence to lawful authority or submission to duress or coercion, express or implied, cannot validate a warrantless search. *Id.* at 222, 228–29, 93 S.Ct. at 2048; *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *United States v. Price*, 599 F.2d at 503. Where two persons, such as a husband and wife, have equal rights to the use or occupation of certain premises, either may give consent to a search, and the evidence thus disclosed can be used against either. *United States v. Stone*, 471 F.2d 170, 173 (7th Cir. 1972), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973); *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); *United States v. Matlock*, 415 U.S. 164, 170–72, 94 S.Ct. 988, 992–93, 39 L.Ed.2d 242 (1974).

■ Involving as it does a problem of credibility, the question presented here is a close one. Upon consideration of the totality of circumstances surrounding the search and after scrutinizing the testimony with respect to it, the Court believes that Nora Otero knowingly and voluntarily consented to the search of the apartment that she shared with her husband and two children. Although, not surprisingly, she was upset when informed that her husband had been arrested, such a mental state does not necessarily foreclose a valid consent. *United States v. Stone*, 471 F.2d at 173. Moreover, both Detectives Robinson and Guzman testified that they attempted for some time to calm her down by explaining where Otero was being held, the circumstances of the

pending arraignment, and that she need not worry because "everything would be alright." They then proceeded to ask questions concerning Munoz, and they showed her a photograph of him. By the time the question concerning the existence of guns or narcotics in the apartment was posed, Mrs. Otero had regained her composure. Rather than a product of coercion or duress, her answer seems to have been one of confidence in the innocence of her husband and knowledge that no such contraband would be found.

■ When a consent to search form was shown to her, read and explained to her in Spanish by Detective Guzman, and presented for her signature, she stated that she understood, and she signed willingly.[16] She then led the officers to the bedroom and kitchen, pointing out places where her husband's belongings might be found. The ensuing discovery of documents, address books, and records potentially indicative of Otero's involvement in narcotics trafficking appears to have been as much of a surprise to her as it was to the officers.[17]

On balance, the Court finds the testimony of Nora Otero incredible in several key respects, which ultimately casts doubt upon the veracity of all of her testimony.[18] Most important is her testimony regarding her English language proficiency. Mrs. Otero, who testified through an interpreter, stated several times that she speaks little English, never speaks to her husband or children except in Spanish, and conducts all her personal affairs (working, shopping, banking, etc.) in Spanish, relying upon an interpreter at all times when English is necessary. She testified also, however, that she has lived in the United States for seven years, that be-

fore leaving Colombia she studied English in high school for several years, that her husband, whom she married in 1975, is fluent in English and her two-year old daughter learned English from watching television, that she also watches television and goes to English language movies, and, finally, that she worked for three years as a seamstress in a knitting mill in Brooklyn. Given the extent of Nora Otero's exposure to the English language over a period of up to ten years, we find it difficult to believe her further testimony that she had no comprehension of the consent to search form presented to her and that she believed it to be a receipt for articles seized from the apartment. Indeed, both Robinson and Guzman testified that Mrs. Otero's command of English was good enough that she seemed to have no need of an interpreter and that she acknowledged her understanding of the waiver.

■ This is not a case involving an alleged consent by an illiterate, a mental incompetent, or a juvenile, all of which are relevant considerations on a question of voluntariness. *United States v. Price*, 599 F.2d at 503. On the contrary, Mrs. Otero has had one and one-half years of post-high school education in commercial school, and during her testimony she demonstrated a high degree of poise. Although the officers were not required to inform Mrs. Otero of her right to refuse consent, *Schneckloth v. Bustamonte*, 421 U.S. at 227, 93 S.Ct. at 2048, the fact that they did so inform her is another factor to be considered in determining the voluntariness of her consent. *Id.; United States v. Price*, 599 F.2d at 503 n.11.

■ The Government rightly bears a heavy burden of proof in justifying a war-

---

**16.** *See* text of consent to search form *supra* at note 4.

**17.** Defendant Otero's contention that the areas where the records seized were found in the bedroom and kitchen were areas over which he exercised exclusive control is without support in the record. Although Nora Otero told the officers that the records belonged to her husband, we do not infer from this that she had no authority to use the night table, dresser, and cabinets in question, all of which were located

in common areas of the apartment with respect to which she had an undisputed right of access and use. On the contrary, we believe that her relationship to and common authority over the premises searched gave her sufficient authority to consent to the search. *United States v. Matlock*, 415 U.S. 164, 172, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

**18.** The direct testimony of Mrs. Nora Otero is summarized *supra* at note 7.

rantless search under the circumstances here. The Court does not condone the failure of the officers to seek in advance defendant Otero's consent to search his apartment. Nevertheless, based upon the signed consent to search form, the testimony of Detectives Robinson and Guzman, the improbability of key parts of Mrs. Otero's testimony, and the other circumstances discussed above, the Court concludes that the consent was valid and that defendant Otero's motion to suppress the fruits of that search must, accordingly, be denied.

### F. Post-Arrest Searches and Statements

#### 1. Theodoro Hernandez and Carlos Cardona

Following their arrests, Ocampo, Hernandez, and Cardona were transported to the 72nd precinct in Brooklyn where they were searched. Found on Hernandez was a small black address book, various papers, and a driver's license in the name of Amparo Torres. Seized from Cardona was a ring with three keys. Later that evening at DEA headquarters on 57th Street in Manhattan, Cardona was informed of his *Miranda* rights and the charges against him, photographed, and fingerprinted. Thereafter, he made two statements to Detective Guzman. Both defendants now seek to suppress the articles seized from them; in addition, Cardona seeks to suppress his statements.[19]

 Hernandez' motion is denied. Having lawfully arrested Cardona, the police could lawfully search his person either at the scene of the arrest or later at the station. *Abel v. United States*, 362 U.S. 217, 239, 80 S.Ct. 683, 697, 4 L.Ed.2d 668 (1960); *United States v. Edwards*, 415 U.S. 800, 804, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974).

 Because Cardona's arrest was unlawful, the fruits of that arrest are tainted

and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York*, 442 U.S. at 215–219, 99 S.Ct. at 2258–60. Accordingly, Cardona's post-arrest statements and the ring and three keys must be suppressed.

#### 2. Jose V. Otero and Nicholas Antonio Munoz-Velasquez

Soon after their arrival at the 70th precinct, defendants Otero and Munoz were searched. Seized from Otero was a wallet and various papers. Thereafter, they were taken to DEA headquarters in Manhattan, where each made statements to different officers and at different times. After receiving his rights for the second time from Detective Robinson, Otero acknowledged his understanding and proceeded to make a statement. Munoz, because he spoke little or no English, was informed in Spanish of his *Miranda* rights by Detective Ramos.[20] Munoz acknowledged his understanding and, after giving certain pedigree information for the DEA Form 202, he made a statement explaining his presence at the Burger King. When he concluded, he stated that he had no more to say and asked to see a lawyer.

 There is no basis in the record to conclude that the statements made by either defendant were in any way coerced or the product of duress, either physical or mental. Both Otero and Munoz stated that they understood their rights, and each spoke freely. The procedures followed by Group 5 following the arrests were consistent with the principles set forth in *Miranda v. Arizona, supra,* and, accordingly, defendants' motions to suppress their statements

19. Defendant Cardona's motion to suppress the photograph taken after his arrest and the identifications based upon it are considered *infra* at 1239–1240.

20. We reject defendant Munoz' challenge to the adequacy of the Spanish translation of *Miranda* rights contained in DEA Form 13B (Govt. Ex.

53). Upon consideration of the translation of the Spanish wording into English by one of the interpreters at the hearing (*see* note 4 *supra* ), the Court is satisfied that DEA Form 13B complies with the *Miranda* decision and subsequent cases.

are denied.[21] Because the arrests of both defendants were proper, the subsequent searches of their persons at the 70th precinct were lawful. *Abel v. United States,* 362 U.S. at 239, 80 S.Ct. at 697; *United States v. Edwards,* 415 U.S. at 804, 94 S.Ct. at 1237. Their motions to suppress objects seized as a result of that search are also denied.

### G. Photographic and In-court Identifications of Cardona

Defendant Cardona seeks to suppress photographic and in-court identifications of him by Robert Rankin, building superintendent at 23–35 Broadway in Astoria, Queens. Citing *Wong Sun v. United States, supra,* Cardona contends that because his arrest was unlawful, the photograph taken thereafter at DEA headquarters and any identification based upon it (including an in-court identification) are "fruits of the poisoned tree" and, accordingly, must be suppressed.

Similar contentions were considered recently in *United States v. Crews,* —— U.S. ——, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1979). There, the Court confirmed that the exclusionary sanction articulated in *Wong Sun* extends to *any* "fruits" of a constitutional violation, "whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *Id.* at ——, 100 S.Ct. at 1249. Predicated on facts not

materially different from those presented here, the Court held that an in-court identification of a defendant by the victim of a crime should not be suppressed as the fruit of the defendant's unlawful arrest, even though after the arrest the victim made photographic and line-up identifications of the defendant stemming directly from the unlawful arrest. The Court concluded that the in-court identification was not the product of the illegal arrest but had an independent, untainted basis. *Id.* at ——, 100 S.Ct. at 1254.[22]

■ In this case, as in *Crews,* the photo and photographic identification were clearly fruits of the unlawful arrest of Cardona and must be suppressed. With respect to the in-court identification, however, no such clear connection exists. Although Cardona contends that the basis for Rankin's identification of him is the photo rather than independent observation, the Court believes that the four occasions on which Rankin observed Cardona in the final five or six months of 1979—three to four minutes in September, two to four minutes in November, and for periods of unspecified duration on two other occasions during the summer in the vicinity of the building—constitute a sufficient independent basis for the identification. We note in this regard that several days prior to the unlawful arrest of Cardona, Rankin gave Detective Robinson a description of one of the occupants of 23–35 Broadway, apartment 3F, as "tall, thin, wavy hair, pock marks on the face, walked a little odd." That Rankin had given to the

21. Munoz has been indicted as an adult, not as a juvenile. No claim was made that he was entitled to the protections accorded a juvenile under the Juvenile Delinquency Act, 18 U.S.C. §§ 5031 *et seq.,* until the final day of the suppression hearing. In view of the fact that Munoz has not moved to challenge the indictment on the basis of his alleged age of seventeen and one-half years, we conclude that he is not a juvenile and that he was properly charged as an adult. Accordingly, the provisions of the Juvenile Delinquency Act are inapplicable.

22. Five of the Justices explicitly rejected any implication that a defendant's face can be a suppressible "fruit" of an illegal arrest, under any circumstances. Relying on *Frisbee v. Col-*

*lins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the Justices, *per* Justice White, concluded that "the evidence ordered suppressed was eyewitness testimony of the victim which was not the product of respondent's arrest, [and] [t]he fact that respondent was present at trial and therefore capable of being identified by the victim is merely the inevitable result of the trial being held, which is permissible under *Frisbee,* despite respondent's unlawful arrest." —— U.S. at ——, 100 S.Ct. at 1254. Justices Brennan, Stewart, and Stevens reserved the question whether a defendant's face can ever be considered evidence suppressible as "fruit" of an illegal arrest. *Id.* at ——, 100 S.Ct. at 1252.

police a description closely resembling Cardona even before the unlawful arrest and the photo identification suggests that Rankin's ability to identify Cardona is not the result of "exploitation of the violation of [his] Fourth Amendment rights." *Wong Sun v. United States*, 371 U.S. at 488, 83 S.Ct. at 417; *United States v. Crews*, —— U.S. at ——, 100 S.Ct. at 1250.

Other circumstances suggesting the untainted basis for Rankin's in-court identification of Cardona are his ability correctly to identify Cardona under the non-suggestive procedure used by Detective Robinson on the day of Cardona's arrest,[23] the very brief period of time that Rankin actually viewed the photograph as compared to the four separate occasions on which he observed Cardona in person, the inability of Rankin to recognize anyone other than Cardona in the photos shown to him, and the accuracy of the description of Cardona given by Rankin several days before the photograph was shown to him. Under the principles of *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), we find, in light of the totality of circumstances, that the courtroom identification by Rankin rests on an independent recollection of his encounters with Cardona during the final five to six months of 1979, uninfluenced by the pretrial photographic identification, and that there exists no substantial likelihood of irreparable misidentification. *United States v. Milhollan*, 599 F.2d at 522–23. Accordingly, Cardona's motion to suppress the in-court identification by Rankin is denied.

### CONCLUSION

In sum, defendants' motions to suppress are granted with respect to Government Exhibits 15, 33, and 52b, all statements made by defendant Cardona after his unlawful arrest, and the photographic identification of defendant Cardona by Robert Rankin. In all other respects defendants' motions are hereby denied.

SO ORDERED.

---

**23.** The relevance of this fact here is only to the extent that it indicates that Rankin's ability to identify Cardona antedated any police misconduct and hence that his in-court identification had an independent source. *See United States v. Crews*, —— U.S. at ——, n. 18, 100 S.Ct. at 1251 n. 18.